

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-11-00415-CR

| | | |
|---|---|---|
| Jonathan Eugene Simon | § | From the 297th District Court |
| | § | of Tarrant County (1125095D) |
| v. | § | January 31, 2013 |
| | § | Opinion by Justice Gabriel |
| The State of Texas | § | (nfp) |

## JUDGMENT

This court has considered the record on appeal in this case and holds that there was some error in the trial court's judgment. The judgment is modified to correctly reflect that Appellant pled "not true" to the petition to adjudicate. It is ordered that the judgment is affirmed as modified.

SECOND DISTRICT COURT OF APPEALS

By_____
Justice Lee Gabriel



# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-11-00415-CR

JONATHAN EUGENE SIMON                                        APPELLANT

V.

THE STATE OF TEXAS                                              STATE

----------

### FROM THE 297TH DISTRICT COURT OF TARRANT COUNTY

----------

### MEMORANDUM OPINION[1]

----------

### Introduction

Appellant Jonathan Eugene Simon appeals his conviction and sentence for burglary after the trial court adjudicated his guilt and revoked his deferred-adjudication community supervision (probation).  In his sole point, he claims that the trial court abused its discretion by revoking his probation because the evidence is insufficient to show that he violated one of the terms of his probation

---

[1]*See* Tex. R. App. P. 47.4.

by committing a new offense. We modify the judgment of the trial court and affirm.

## Procedural History

In 2009, Appellant pled guilty to burglary of a habitation in exchange for five years' probation and a $500 fine. One of the terms of his probation required that he not commit a new offense.

In 2011, the State filed its petition to adjudicate, alleging only that Appellant committed a new offense—hindering apprehension. *See* Tex. Penal Code Ann. § 38.05 (West 2011). Appellant pled "not true," and after a hearing, the trial court found the allegation true, adjudicated Appellant's guilt, revoked his probation, and sentenced him to ten years' confinement.[2]

## Standard of Review

The decision to adjudicate guilt and revoke deferred adjudication probation is reviewable in the same manner as a revocation of ordinary or what is commonly known as "straight" probation. Tex. Code Crim. Proc. Ann. art. 42.12, § 5(b) (West Supp. 2012).

---

[2]The judgment reflects that Appellant pled "true" to the petition to adjudicate. This is contradicted by the record of the hearing, however, which reflects that Appellant pled "not true" and that his counsel presented evidence and argument in his defense. Accordingly, we reform the judgment to correctly reflect that Appellant pled "not true." Tex. R. App. P. 43.2(b); *see French v. State*, 830 S.W.2d 607, 609 (Tex. Crim. App. 1992); *Carnley v. State*, 366 S.W.3d 830, 833 n.5 (Tex. App.—Fort Worth 2012, pet. ref'd); *Blavier v. State*, No. 06-11-00147-CR, 2011 WL 6288046, at *2 (Tex. App.—Texarkana, Dec. 15, 2011, no pet.) (mem. op., not designated for publication) (reforming judgment to reflect plea of not true).

We review an order revoking probation for an abuse of discretion. *Rickels v. State*, 202 S.W.3d 759, 763 (Tex. Crim. App. 2006); *Cardona v. State*, 665 S.W.2d 492, 493 (Tex. Crim. App. 1984). In a revocation proceeding, the State must prove by a preponderance of the evidence that the defendant violated the terms and conditions of his probation. *Cobb v. State*, 851 S.W.2d 871, 873 (Tex. Crim. App. 1993). The trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony, and we review the evidence in the light most favorable to the trial court's ruling. *Cardona*, 665 S.W.2d at 493; *Garrett v. State*, 619 S.W.2d 172, 174 (Tex. Crim. App. [Panel Op.] 1981); *Allbright v. State*, 13 S.W.3d 817, 818–19 (Tex. App.—Fort Worth 2000, pet. ref'd). If the State fails to meet its burden of proof but the trial court still revokes probation, the trial court abuses its discretion. *Cardona*, 665 S.W.2d at 493–94.

## Discussion

Appellant's light blue Chevrolet Caprice was parked at the Park Vista Townhomes in Watauga when two officers arrived around 11:00 in the morning with an arrest warrant for Deatrice Pendergraph. They heard that Pendergraph might be with Appellant in the apartment leased to her cousin, Tendra Brookins.

Officer Elston had covered the back door of Brookins's apartment as Officer Williams knocked on the front, announcing "Police, open the door." There was no answer.

4

Officer Williams contacted Detective Paula Hernandez, who, after obtaining a land-line number for the apartment, dialed the number. When no one picked up on the other end, she left a message stating that the police were looking for Pendergraph.

After Detective Hernandez finished her message, Appellant opened the front door with a small child in tow. Appellant was wearing a white towel over dark shorts and explained that he had been in the shower. Officer Williams testified at the adjudication hearing that it did not appear to him that Appellant had been in the shower because there was no water on Appellant's hair, skin, or towel.

When Officer Williams asked if Pendergraph was in the apartment, Appellant said she was not. And when the officer asked if he might come in and look for himself, Appellant asked if he had a search warrant. Officer Williams replied he did not and Appellant said that he could not let him in because the apartment belonged to someone else.

Suspecting that Pendergraph was hiding inside the apartment, the officers kept Appellant outside while Detective Hernandez contacted Brookins to get her consent for a search. As they waited for Brookins to arrive, the officers continued to ask Appellant if Pendergraph was in the apartment. He consistently answered that she was not there, and he suggested that they look for her at a day care center where she worked in southwest Fort Worth.

The officers noticed Appellant using his cell phone during this time, and when Officer Williams asked him to call Pendergraph on her cell phone, he refused, saying she would not answer if he did.

Evidence admitted at the hearing, that included phone company records, shows that during the time that Appellant was outside with the police while they waited for Brookins, Appellant exchanged calls and text messages with Brookins, with his mother, and with Pendergraph's sister, Tae.[3]

Although Appellant refused to call Pendergraph—and the phone records show that he did not, in fact, call her the entire time he was outside with the police, a period that began around 11:00 that morning—at 12:27, she texted him: "Im cumin down." Immediately, he texted back: "No."

At 12:28, Pendergraph texted: "Fatty said they got a warrant."[4] Appellant replied: "For who?" She texted back: "Me." Appellant replied: "Ima have to tell them u here first so I want go too jail."

Officer Williams testified that Brookins arrived at approximately 12:30 and gave her consent for the officers to search the apartment. At 12:32, Appellant

_____

[3]The phone records show that Appellant called Brookins at 11:44 a.m., took a seventeen-second call from Tae at 11:52, called his mother twenty-four seconds after that and took a call from her at 11:56, took two incoming calls lasting three minutes each at 11:59 and 12:00 from someone designated "NY" on his phone and from Tae, respectively, and, finally, made another call to Brookins at 12:04.

[4]The record shows that "Fatty" was a nickname for Brookins.

texted Pendergraph: "Where u at?" She replied: "Im here." At 12:33, he texted "Kum out."

The officers went into the apartment and called out for Pendergraph. She immediately came down the stairs and was promptly arrested on the warrant.

Officer Williams then advised Appellant that he, too, was under arrest. Appellant produced his cellphone and tried to show Officer Williams the one text he had sent to Pendergraph, asking, "Where u at?" Officer Williams confiscated the phone and read through the messages that Appellant and Pendergraph had exchanged while Appellant was outside and refusing to call her, claiming she wouldn't answer.

Officer Williams testified that Pendergraph admitted she and Appellant had both been in the apartment when the officer had knocked on the door, did not know which one of them the police were looking for because they had both been in trouble in the past, realized that the officers were looking for her when Detective Hernandez left the message on the phone, and made a plan for her to hide that included Appellant opening the door when he did.

Pendergraph and Appellant both testified at the hearing. She denied making any statements to Officer Williams indicating that she and Appellant had planned for her to hide from the police. Both of them denied that Appellant had known that Pendergraph was in the apartment when the officers came to the door.

7

Pendergraph also testified that Appellant is the father of her two children. She testified that she and the children had spent the night before her arrest at the apartment with Brookins and her two children. She stated that she called Appellant that morning to ask him for a ride to take the children to school but that when he arrived, he was ill, so she drove one child to school in Appellant's car and left the younger child, who was sleeping, in the apartment with Appellant. When she returned to the apartment, Appellant was asleep, so not wanting to wake him, she did not tell him that she had come back.

Pendergraph explained that when the police knocked on the door, she hid under her cousin's bed, and that while talking to family members on her cell phone, she heard the message on the land line answering machine left by Detective Hernandez saying that the police were looking for her. She claimed that she never knew that Appellant had answered the door until her cousin had arrived and told her by phone that Appellant and the child were outside with the police. She further testified that, after finishing up calls to her family, she saw Appellant's text asking where she was and that he had not known she had returned to the apartment until she had texted him "Im here."

Appellant testified that he was in the shower when the police knocked on the door and that he did not know Pendergraph had come back. He acknowledged that once he was outside, through text messages and phone calls, he put it together that she was back, and he texted her to tell her that he was going to have to tell the police where she was so he would not go to jail.

8

Appellant's lawyer asked him if he would have protected himself over the mother of his children. He replied, "Yes, ma'am, I will."

After hearing all the testimony and arguments of counsel, and after pointing out that it was the trial court's duty "to determine the credibility of the witnesses" and that the court was "the sole arbiter of that in this hearing," the judge noted that he had "evaluated the testimony" and was convinced to a degree exceeding the State's burden of proof that Appellant had violated the conditions of his probation as alleged in the State's petition. We have examined the record of the hearing in the appropriate light and hold that the record supports the trial court's ruling that Appellant committed the offense of hindering apprehension by a preponderance of the evidence. *See Cardona*, 665 S.W.2d at 493; *Allbright*, 13 S.W.3d at 818–19. Therefore, we hold that the trial court acted within its discretion by revoking Appellant's probation, and we overrule Appellant's sole point on appeal. *See Rickels*, 202 S.W.3d at 763; *Cardona*, 665 S.W.2d at 493; *Brown v. State*, 354 S.W.3d 518, 519 (Tex. App.—Fort Worth 2011, pet. ref'd); *see generally Cherry v. State*, 215 S.W.3d 917, 919–20 (Tex. App.—Fort Worth 2007, pet. ref'd).

## Conclusion

Having overruled Appellant's sole point, the trial court's judgment as modified is affirmed.

LEE GABRIEL
JUSTICE

PANEL:  MCCOY, MEIER, and GABRIEL, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  January 31, 2013